# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | |
|---|---|
| STAN WARREN MOORE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 5:16-cv-00022-MHH-SGC |
| ) | |
| SERGEANT JAMES SEALEY, ) | |
| ) | |
| Defendant. ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

The plaintiff filed a *pro se* complaint seeking monetary damages or injunctive relief pursuant to 42 U.S.C. § 1983 for violations of his civil rights. (Doc. 1). The plaintiff names Sergeant James Sealey as the sole defendant. (*Id.* at 3). The plaintiff seeks compensatory damages and requests that the court order Sgt. Sealey "to find some other line of work" and to attend "anger management classes." (*Id.* at 4). In accordance with the usual practices of this court and 28 U.S.C. § 636(b)(1), the complaint was referred to the undersigned magistrate judge for a preliminary report and recommendation. *See McCarthy v. Bronson*, 500 U.S. 136 (1991).

### I.     PROCEDURAL HISTORY

On February 8, 2016, the undersigned entered an Order for Special Report directing the Clerk to forward copies of the complaint to the named defendant and

directing the defendant to file a special report addressing the plaintiff's factual allegations. (Doc. 5). The undersigned advised the defendant that the special report could be submitted under oath or accompanied by affidavits and, if appropriate, the court would consider it as a motion for summary judgment filed pursuant to Rule 56 of the *Federal Rules of Civil Procedure*. (*Id.*).

On April 4, 2016, the defendant filed a special report, supplemented by affidavits and/or other evidence. (Doc. 12). On April 28, 2016, the plaintiff requested leave to conduct additional discovery. (Doc. 13). On June 2, 2016, the undersigned granted the plaintiff's discovery to the extent he requested production of a second body chart and denied the request in all other respects. (Doc. 14). The same day, the undersigned notified the parties that the court would construe the special report as a motion for summary judgment and notified the plaintiff that he had twenty-one (21) days to respond to the motion for summary judgment by filing affidavits or other material. (Doc. 15). The undersigned also advised the plaintiff of the consequences of any default or failure to comply with FED. R. CIV. P. 56. (*Id.*). *See Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985).

On June 10, 2016, the defendant submitted the additional discovery ordered. (Doc. 16). On July 7, 2016, the plaintiff filed a response. (Doc. 19). However, the response is not filed under oath or penalty of perjury. (*Id.*). Therefore, any facts

contained therein shall not be considered. This matter is now before the court on the defendant's motion for summary judgment and the response thereto.

## II.  STANDARD OF REVIEW

Because the court has construed the defendant's special report as a motion for summary judgment, FED. R. CIV. P. 56 governs the resolution of the motion. Under Rule 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party. *Chapman v. AI Transport,* 229 F.3d 1012, 1023 (11th Cir. 2000).  The burden of proof is upon the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues of material fact and that he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial, and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Bennett v. Parker*, 898 F.2d 1530, 1532-33 (11th Cir. 1990).  As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case.  "In such a situation, there can be 'no

genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." [citations omitted]. Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof. This rule facilitates the dismissal of factually unsupported claims prior to trial.

*Bennett*, 898 F.2d at 1532.

However, any "specific facts" pled in a *pro se* plaintiff's sworn complaint must be considered in opposition to summary judgment. *See Caldwell v. Warden, FCI Talladega,* 748 F.3d 1090, 1098 (11th Cir. 2014) (citing *Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986)). Additionally, because the plaintiff is *pro se*, the court must construe the complaint more liberally than it would pleadings drafted by lawyers. *Hughes v. Rowe,* 449 U.S. 5, 9 (1980). "*Pro se* pleading are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed." *Boxer X v. Harris*, 437 F.3d 1107, 1110 (11th Cir. 2006).

### III. EVIDENTIARY RULINGS

#### A. Incident Report

In support of his motion for summary judgment, defendant Sealey submitted an Alabama Department of Corrections Incident Report detailing the November 14, 2015 altercation between the plaintiff and Sgt. Sealey. (Doc. 12-1 at 2). Bibb County Correctional Facility Warden Willie Bennett certified the nine page report

"as a true and correct copy taken from [the plaintiff's] electronic file." (Doc. 12-1 at 1). The plaintiff asserts Warden Bennett has no personal knowledge of the November 14, 2015 incident and Bennett "did not state the information contained in the report was true or that he had any personal knowledge concerning who prepared it." (Doc. 19 at 15). From this platform, the plaintiff argues "Warden Bennett's affidavit has no bearing on whether or not" Sealey is entitled to summary judgment and is inadmissible under FED. R. CIV. P. 56(c). (Doc. 19 at 15-16).

The plaintiff's opposition to Warden Bennett's affidavit, and by implication the nine page incident report, is without merit. The purpose of Warden Bennett's affidavit is "[t]o satisfy the requirement of authenticating or identifying an item of evidence" by "produc[ing] evidence sufficient to support a finding that the item is what the proponent claims it is." FED. R. EVID. 901(a). Warden Bennett's attestation is simply to certify that the Incident Report is a "public record or statement from the office where items of this kind are kept." FED. R. EVID. 901(7). Accordingly, the Incident Report has been properly authenticated.

The undersigned next addresses what appears to be a general objection to the admissibility of the Incident Report as hearsay. The plaintiff asserts "the incident report is not even signed or notarized" and that the witness statements included in the incident report are "unsworn." (Doc. 19 at 15-19). Warden Bennett's "certificate of authenticity does not cast any light on the underlying hearsay

5

problem of the statements or their fundamental flaws as affidavits under Fed. R. Civ. P. 56 (e). Simply, the hearsay problem here contains two layers: the report itself and the statements contained therein." *Bozeman v. Orum*, 199 F. Supp. 2d 1216, 1222–23 (M.D. Ala. 2002), *on reconsideration in part sub nom. Bozeman ex rel. Estate of Haggard v. Orum*, 302 F. Supp. 2d 1310 (M.D. Ala. 2004), and *aff'd*, 422 F.3d 1265 (11th Cir. 2005).

The Incident Report itself is hearsay but it is "admissible under the public records exception to the hearsay rule because" it is "the official reporting document for" the Department of Corrections for the November 14, 2015 investigation. *White v. City of Birmingham, Ala.*, 96 F. Supp. 3d 1260, 1273 (N.D. Ala. 2015), *as amended* (May 27, 2015) (citing FED. R. EVID. 803(8)(A)(iii)). This hearsay exception, however, only "allows the introduction of "*factual findings* resulting from an investigation made pursuant to authority granted by law[.]" *Bozeman*, 199 F. Supp. 2d at 1222-23 (emphasis in original).[1] The exception does not include "evidence gathered by the investigating body on which to base its findings," *i.e.*, the witness statements attached to the Incident Report. *Id.* None of the witness statements attached to the report are sworn to under oath or penalty of perjury. "Unsworn statements 'do[ ] not meet the requirements of Fed. Rule Civ.

---

[1] The defendant has submitted affidavits containing testimony concerning every fact finding made in the investigative report. (Doc. 12-1 at 10 (investigative report)); (Docs 12-2 to 12-4 (Sgt. Sealey, Lt. Waver, and Ofcr. Walker affidavits)).

Proc. 56(e)' and cannot be considered by a district court in ruling on a summary judgment motion." *Carr v. Tatangelo*, 338 F.3d 1259, 1273 n.26 (11th Cir. 2003), *as amended* (Sept. 29, 2003) (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158 n.17 (1970)). As such, the witness statements will not be considered.

**B. Inmate Body Chart**

The plaintiff sets forth three reasons the November 14, 2015 body chart submitted by Sgt. Sealey "should not be considered for summary judgment purposes." (Doc. 19 at 16). First he declares, "a person, like the plaintiff can have injuries which will not show up on a visual external view of the body." (*Id.*). While the plaintiff's declaration might have some bearing on the evidentiary weight of the body chart, it has no bearing on the admissibility of the body chart. The content of the body chart falls within a clearly established exception to the hearsay rule. *See* FED. R. EVID. 803(4) (statements "made for" and "pertinent to -- medical diagnosis and treatment" and that "describe medical history; past or present symptoms or sensations; their inception; or their general cause" are excepted from the hearsay rule). As such, the plaintiff's objection is overruled, and the content of the medical chart shall be considered as evidence in its entirety.

Next, the plaintiff asserts "Bibb County Correctional Officers, as well as officers at other facilities in Alabama are known to have facility health care nurses fabricate body charts when officers have assaulted or beaten inmates". (Doc.19 at

16). This is an attempt to state a fact, and it will not be considered because the plaintiff did not sign his response under oath or penalty of perjury. The statement also is a conclusory assertion lacking factual support and having no bearing on the validity of the medical chart in the plaintiff's case. *See Evers v. General Motors Corp.,* 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations [in an affidavit] without specific supporting facts have no probative value.").

The plaintiff further attaches the affidavit of inmate Donnie White as evidence to support his own unsworn, conclusory statement. (Doc. 19. at 23-25). To the extent the affidavit has any bearing on the issue, *i.e.* medical body charts, Inmate White declares he is a former inmate at Bibb County Correctional Facility and has personally heard "nurses talking about officers wanting them to falsify charts" on inmates they had beaten. (*Id.* at 25). This statement is hearsay within hearsay and is not only immaterial and irrelevant to facts underlying the plaintiff's case but is not based on Inmate White's personal knowledge of the plaintiff's case Accordingly, the White affidavit shall not be considered as evidence.

Finally, the plaintiff objects to the medical body chart on the ground that he alleged in the complaint his "body was videoed/photographed <u>after</u> the body chart was done." (*Id.* at 16). The plaintiff made no such allegation in his sworn complaint, and his response is not signed under oath. (Docs. 1, 19). Accordingly, this declaration shall not be considered as evidence. The plaintiff also complains

8

that the defendant did not produce the photographs or video as part of his special report. (Doc. 19 at 16). However, the Order for Special Report afforded the plaintiff every opportunity to request leave of court to ask the defendant to produce these items as evidence, but the plaintiff did not do so. The plaintiff was aware of his ability to make such a request, as he timely requested, and the defendant was ordered to produce, a second body chart that had not been made a part of the special report. (Docs. 13, 14, and 16-1). It is the plaintiff's burden to produce evidence to support his claims and to rebut the defendant's summary judgment position. The November 14, 2015 body chart shall be considered as evidence.

## IV.  SUMMARY JUDGMENT FACTS

Around 2:30 p.m. on November 14, 2015, the plaintiff was escorted to the shift office in B3 dorm to see Lt. Waver. (Doc. 1 at 3, 5).[2] While in the shift office, the plaintiff and "several other inmates" were accused "of assaulting inmate Ratcliff." (Doc. 12-2 at 1). Inmate Ratcliff was also present in the shift office. (*Id.*).

Lt. Waver asked the plaintiff a question about the assault, which he answered. (Doc. 1 at 3). Lt. Waver then asked Inmate Ratcliff "if what the plaintiff had said was true, and" Inmate Ratcliff "made a motion indicating that he did not know." (*Id.* at 3). The plaintiff told Inmate Ratcliff to tell Waver the truth,

---

[2] The plaintiff spells this corrections officer's surname "Wavier," but the correct spelling is 'Waver.' (Doc. 12-3 at 1-2).

9

but defendant Sealey yelled at him to "shut the f—k up." (*Id.* at 3-4). Sgt. Sealey testifies that he gave the plaintiff "a direct order to be quiet," but the plaintiff refused to do so. (Doc. 12-2 at 1).

The plaintiff does not deny that he ignored Sgt. Sealey and turned to Lt. Waver. (Doc. 1 at 4). Lt. Waver attests that during questioning, the plaintiff "began to get loud and [was] trying to talk over me." (Doc. 12-3 at 1). Sgt. Sealey ordered the plaintiff "several times to be quiet," but the plaintiff "kept on talking." (*Id.*). The plaintiff does not dispute Lt. Waver's testimony.

The plaintiff declares Sgt. Sealey then grabbed him from behind by the neck, choked him until he was about to lose consciousness, slammed him to the floor, got on top of him, and continued to choke him with one hand. (Doc. 1 at 4-5). With his free hand drawn back into a fist, Sealey called the plaintiff a m-----f----r and dared him to say anything else. (*Id.* at 5). Lt. Waver and Officer Walker yelled at Sgt. Sealey to stop, but Sealey acted as though he was "in a world of his own" and continued to choke the plaintiff "with severe force" in a fit of rage. (*Id.*). Lt. Waver pulled at Sgt. Sealey, who "finally came to his senses" and got off the plaintiff. (*Id.*). Lt. Waver demanded Sgt. Sealey leave the office several times before Sealey complied. (*Id.*). The plaintiff put up no resistance the entire time Sgt. Sealey was assaulting him. (*Id.*).

Defendant Sealey disputes the plaintiff's version of events. (Doc. 12-2 at 1). Sgt. Sealey testifies that after refusing to obey his second order to be quiet, and "[w]hile being questioned by the Shift Supervisor, [the plaintiff] turned in an aggressive manner to Sealey, who was in the middle of [the plaintiff] and Ratcliff and started yelling at Ratcliff." (*Id.*). Sealey "did not know what [the plaintiff] was about to do and "'in fear of' his "life" conducted "a one on one take down of [the plaintiff] to the floor and all force ceased." (*Id.*).

Lt. Waver attests defendant Sealey grabbed the plaintiff's "wrist and performed a two on one take down to the front of" the plaintiff. (Doc. 12-3 at 1). Both Sgt. Sealey and Moore "landed on the floor. All force ceased." (*Id.*). Officer Walker testifies that she heard Sgt. Sealey direct the plaintiff "to face the wall and submit to being handcuffed" but the plaintiff "had to be taken down in order for the handcuffs to be applied." (Doc. 12-4 at 1). Officer Walker attests that at no time did she yell for Sealey to stop. (*Id.*).

Officer Walker escorted the plaintiff to the health care unit for a body chart. (Doc. 1 at 5). While in the unit, the plaintiff reported that he "was in" an "altercation with Sgt." (Doc. 12-1 at 3). Nurse Morton found the plaintiff to be alert and verbally responsive and noted old scars on the top of his head and upper left eye, as well as a scratch on the left side of his forehead. (*Id*.). The plaintiff

complained of right elbow pain. (*Id.*). Nurse Morton reported seeing no redness or swelling at that time. (*Id.*).

After completion of the body chart, the plaintiff was taken back to the shift office. Lt. Waver called Captain John Hutton as the plaintiff "sat in front of him." (Doc. 1 at 5). Lt. Waver reported the assault and informed the plaintiff "he would be contacting Warden Willie Thomas immediately" about the incident. (*Id.*).

The next day the plaintiff attests his back pain was so severe he could hardly get out of bed. (*Id.*). He declares Warden Thomas directed another body chart be performed and that the plaintiff be seen by a doctor. (*Id*. at 5-6). However, the plaintiff has not produced an affidavit from Warden Thomas.

The plaintiff submitted a sick call request about his back pain but was never seen by a doctor. (*Id.*). On November 18, 2015, Nurse Jackson completed a second body chart on the plaintiff at the request of Lt. Waver. (Doc. 16-1 at 1). The plaintiff stated that he had been attacked by defendant Sealey and "his back was injured." (*Id.*). He asserted that he "didn't feel the effects till the next day." (*Id.*). Nurse Jackson examined the plaintiff and noted tattoos on his neck, right arm, back, and lower leg. (*Id.*). The plaintiff was "able to move all extremities." (*Id.*).

The plaintiff testifies he was transferred to another facility "without even being question[ed] by any I&I investigator" or "anyone else for that matter." (Doc.

1 at 6). Sgt. Sealey continued to work at the facility as if nothing had happened. (*Id.*). Prior to his transfer, Lt. Waver did obtain a signed statement from the plaintiff and the "other authorities" who were in the shift office during the assault. (*Id.*). The plaintiff declares Warden Thomas told him Sgt. Sealey was wrong and that he had handled the matter, but the plaintiff has not produced Thomas' testimony, and Sealey does not admit this assertion. (*Id.*).

V. ANALYSIS

A. Eighth Amendment Excessive Force

The Eighth Amendment prohibition against cruel and unusual punishment is triggered when a prisoner is subjected to an "unnecessary and wanton infliction of pain." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

> [W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry [in determining whether a prisoner has suffered unnecessary and wanton pain] is that set out in *Whitley*, whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.

*Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992). In extending *Whitley* to all cases involving allegations of the use of force by prison officials, the Supreme Court reasoned:

> Many of the concerns underlying our holding in *Whitley* arise whenever guards use force to keep order. Whether the prison disturbance is a riot or a lesser disruption, corrections officers must balance the need "to maintain or restore discipline" through force

against the risk of injury to inmates. Both situations may require prison officials to act quickly and decisively. Likewise, both implicate the principle that "'[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'"

*Hudson*, 503 U.S. at 6 (quoting *Whitley*, 475 U.S. at 321-22).

"The use of force must stop when the need for it to maintain or restore discipline no longer exists." *Skrtich v. Thornton*, 280 F.3d 1295, 1304 (11th Cir. 2002) (citing *Whitley*, 475 at 320-21). Therefore, if a non-compliant inmate has been restrained by guards and no longer poses a threat, he "cannot be subjected to gratuitous or disproportionate force that has no object but to inflict pain." (*Id.*).

With these concerns in mind, the Supreme Court set out certain factors to be considered when evaluating whether the force used was excessive. These factors include: (1) the need for application of force; (2) the relationship between that need and the amount of force used; (3) the threat reasonably perceived by the responsible official; (4) any efforts to temper the severity of a forceful response; and (5) the extent of the injury suffered by the inmate. *Id*. at 7; *see Hewett v. Jarrad*, 786 F.2d 1080, 1085 (11th Cir. 1986).

In applying the foregoing factors to the facts of a particular case, the Supreme Court has instructed:

> That is not to say that every malevolent touch by a prison guard gives rise to a federal cause of action. *See Johnson v. Glick*, 481 F.2d at 1033 ("Not every push or shove, even if it may later seem

14

> unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights."). The Eighth Amendment's prohibition of "cruel and unusual" punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not a sort "'repugnant to the conscience of mankind.'"

*Hudson*, 503 U.S. at 9 (internal citations omitted).

### B. Qualified Immunity

The defendant asserts the affirmative defense of qualified immunity in connection with plaintiff's excessive force claim. (Doc. 12 at 4-13). However:

> In this Circuit, a defense of qualified immunity is not available in cases alleging excessive force in violation of the Eighth Amendment, because the use of force 'maliciously and sadistically to cause harm' is clearly established to be a violation of the Constitution by the Supreme Court decisions in *Hudson* [502 U.S. at 8] and *Whitley* [475 U.S. at 320-21]. *See Johnson. v. Breeden*, 280 F.3d 1308, 1319 (11th Cir. 2002). There is simply no room for a qualified immunity defense when the plaintiff alleges such a violation. *Id.* The only question, then, is whether the plaintiff has alleged facts sufficient to survive a motion to dismiss or motion for summary judgment. If he has done so, that is the end of the inquiry.

*Skrtich v Thornton*, 280 F.3d at 1301. Since qualified immunity is not at issue, the remainder of this section is dedicated to determining whether the plaintiff has alleged sufficient facts to survive the defendant's motion for summary judgment.

### C. Discussion

Applying the first, second and third factors in evaluating the excessive force claim against Sgt. Sealey, it is undisputed that the plaintiff continued to talk and became loud during the investigation. (Doc. 12-3 at 1). Although his speech was

15

directed toward Inmate Ratcliff and Lt. Waver, the plaintiff does not deny that defendant Sealey was standing in between the plaintiff and Inmate Ratcliff. (Doc. 1 at 3; Doc. 12-2 at 1). The plaintiff twice refused Sgt. Sealey's orders to be quiet. (Doc. 1 at 3; Doc. 12-3 at 1).

"Prison guards may use force when necessary to restore order and need not wait until disturbances reach dangerous proportions before responding." *Danley v. Allen*, 540 F.3d 1298, 1307 (11th Cir. 2008) (quoting *Bennett v. Parker*, 898 F.2d 1530, 1533 (11th Cir. 1990)). "And prison guards do not have the luxury or obligation to convince every inmate that their orders are reasonable and well-thought out." *Id.* (quoting *Bennett*, 898 F.2d at 1533).

The plaintiff's contention that no force should have been used because all Sealey "had to do was inform the plaintiff under Administrative Regulation #403 that he was giving the plaintiff a direct order to be quiet" or be written a disciplinary infraction is unavailing. (Doc. 19 at 11). Sgt. Sealey had no obligation to convince the plaintiff to obey his direct orders by threatening him with disciplinary action. Considering the events that occurred in the shift office prior to Sgt. Sealey's altercation with the plaintiff, it cannot be said "that it was unreasonable for" Sealey "to believe that some force was necessary. *Fennell v. Gilstrap*, 559 F.3d 1212, 1218 (11th Cir. 2009). Therefore, factors one through three weigh heavily in favor of Sgt. Sealey.

The undersigned now turns to factors four and five, *i.e.* Sgt. Sealey's efforts to temper the severity of his forceful response and the extent of the injury suffered by the plaintiff. The parties hotly dispute the type and level of force used by Sgt. Sealey. The plaintiff attests Sgt. Sealey grabbed him from behind by the neck, choked him until he was about to lose consciousness, slammed him to the floor, got on top of him, and continued to choke him with one hand. (Doc. 1 at 4-5). Then, while screaming obscenities and ignoring Lt. Waver and Officer Walker's pleas to stop, Sgt. Sealey continued to choke the plaintiff "with severe force" in a fit of rage. (*Id.*). Lt. Waver pulled at Sgt. Sealey, who "finally came to his senses" and got off the plaintiff. (*Id.*). Lt. Waver demanded Sgt. Sealey leave the office several times before Sealey left. (*Id.*).

On the other hand, Sgt. Sealey attests the plaintiff was talking in a loud and heated manner toward Lt. Waver and Inmate Ratcliff, refused to obey his orders to be quiet, and continued to behave in a heated manner while he was positioned in between the plaintiff and Inmate Ratcliff. (Doc. 12-2 at 1). Sealey testifies "[he] did not know what [the plaintiff] was about to do" and "in fear of [his] life [he] did a one on one take down of [the plaintiff] to the floor and all force ceased." (*Id.*). Lt. Waver and Officer Walker declare the plaintiff refused to obey Sgt. Sealey's direct orders, assert they witnessed Sealey conduct a takedown of the plaintiff, and thereafter observed all force ceased. (Doc. 12-3 at 1; Doc. 12-4 at 1). Officer

17

Walker denies yelling at Sgt. Sealey to stop. (Doc. 12-4 at1).

The plaintiff was examined by medical staff immediately after the incident. The only injury Nurse Morton observed was a scratch on the left side of the plaintiff's forehead. (Doc.12-1 at 3). The only complaint made by the plaintiff was "right elbow pain," but Nurse Morton saw no redness or swelling to the area. (*Id.*). Even when construed in a light most favorable to the plaintiff, these *de minimis* injuries are completely contrary to the plaintiff's version of events. They are, however, completely consistent with Sgt. Sealey's declaration that he conducted a takedown.

Some four days later, the plaintiff received another body chart. (Doc. 16-1). His only complaint was that his "back was injured." (*Id.*). Nurse Jackson observed no injuries to the plaintiff's body and "he was able to move all extremities." (*Id.*). The plaintiff has produced no other evidence concerning his back pain or verifying any back injury. (*Id.*). Again, even when construed in a light most favorable to the plaintiff, his complaints of back pain for several days after the incident are indicative of *de minimis* injury. Even though the plaintiff's primary complaint against Sgt. Sealey is that Sealey choked him with severe force to the point of unconsciousness for an extended period of time, the plaintiff never complained of neck or throat pain and swelling, nor was any swelling, bruising, fingerprints and the like ever observed about the plaintiff's head and neck. In

short, the undisputed medical records show the plaintiff had no injuries consistent with being choked with severe force for an extended period of time.

Based upon the undisputed medical records compared to the parties disputed version of events, the evidence overwhelmingly weighs in favor of defendant Sealey because it shows that Sealey tempered the forcefulness of his response and the plaintiff suffered little to no injury.  The plaintiff has failed to create a genuine dispute of material fact as to his Eighth Amendment excessive force claim against defendant Sealey, and defendant Sealey is entitled to summary judgment in his favor.

## VI.  RECOMMENDATION

For the reasons stated above, the undersigned **RECOMMENDS** the motion for summary judgment be granted and this action be **DISMISSED WITH PREJUDICE**

## VII.  NOTICE OF RIGHT TO OBJECT

Any party may file specific written objections to this report and recommendation.  Any objections must be filed with the Clerk of Court within fourteen (14) calendar days from the date the report and recommendation is entered.  Objections should specifically identify all findings of fact and recommendations to which objection is made and the specific basis for objection.  Failure to object to factual findings will bar later review of those findings, except

for plain error.  *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986); *Dupree v. Warden*, 715 F.3d 1295, 1300 (11th Cir. 2013).  Objections also should specifically identify all claims contained in the complaint that the report and recommendation fails to address.  Objections should not contain new allegations, present additional evidence, or repeat legal arguments.  An objecting party must serve a copy of its objections on each other party to this action.

On receipt of objections, a United States District Judge will make a *de novo* determination of those portions of the report and recommendation to which specific objection is made and may accept, reject, or modify in whole or in part, the findings of fact and recommendations made by the magistrate judge.  The district judge must conduct a hearing if required by law.  Otherwise, the district judge may exercise discretion to conduct a hearing or otherwise receive additional evidence.  Alternately, the district judge may consider the record developed before the magistrate judge, making an independent determination on the basis of that record.  The district judge also may refer this action back to the magistrate judge with instructions for further proceedings.

A party may not appeal the magistrate judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit.  A party may only appeal from a final judgment entered by a district judge.